**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4898-14T1
                A-5221-14T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

WILLIAM D. BROWN,

    Defendant-Appellant.

─────────────────────────────────

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

NIGIL J. DAWSON,

    Defendant-Appellant.

─────────────────────────────────

        Argued (A-4898-14) and Submitted (A-5221-14)
        April 25, 2017 — Decided June 1, 2017

        Before Judges Yannotti and Sapp-Peterson.

        On appeal from Superior Court of New Jersey,
        Law Division, Mercer County, Indictment No.
        12-05-0474.

        David A. Gies, Designated Counsel, argued the
        cause for appellant in A-4898-14 (Joseph E.

Krakora, Public Defender, attorney; Mr. Gies, on the briefs).

Michael D. Grillo, Assistant Prosecutor, argued the cause for respondent in A-4898-14 (Angelo J. Onofri, Mercer County Prosecutor, attorney; Laura Sunyak, Assistant Prosecuor, of counsel and on the brief).

Joseph E. Krakora, Public Defender, attorney for appellant in A-5221-14 (Michele A. Adubato, Designated Counsel, on the brief).

Angelo J. Onofri, Mercer County Prosecutor, attorney for respondent in A-5221-14 (Laura Sunyak, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendants William D. Brown and Nigil J. Dawson were tried before a jury and found guilty of the murder of Tracy Crews, and other offenses. Defendants were both sentenced to aggregate terms of fifty years of incarceration, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. They appeal from the judgments of conviction dated June 8, 2015. We address both appeals in this opinion.

For the reasons that follow, we affirm defendants' convictions and the sentences imposed, with the exception of the sentences imposed on count three for possession of a weapon for an unlawful purpose. We remand the matter to the trial court for entry of corrected judgments of conviction merging count three with count one, in which defendants were charged with murder.

A Mercer County grand jury returned an indictment charging defendants with first-degree murder, N.J.S.A. 2C:11-3(a)(2); N.J.S.A. 2C:2-6 (count one); first-degree felony murder, N.J.S.A. 2C:11-3(a)(3); N.J.S.A. 2C:2-6 (count two); first-degree robbery, N.J.S.A. 2C:15-1 and N.J.S.A. 2C:2-6 (count three); and second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(b) and N.J.S.A. 2C:2-6 (count four).

We briefly summarize the evidence presented at trial. On September 12, 2008, at approximately 11:00 p.m., Crews, a known member of the Bloods street gang, was shot three times at his home on Whittaker Avenue in Trenton. One of the shots struck Crews in the neck, and he later died as result of the injuries he sustained in the shooting.

Crews' wife, Sheena Robinson-Crews, was sitting in her car nearby, speaking with a friend on the telephone, and heard the gunshots. Robinson-Crews observed a person standing in front of her residence. The person stumbled along the sidewalk and came into the light from a nearby liquor store. Robinson-Crews then recognized the person as her husband.

Robinson-Crews hung up the phone and rushed toward her husband, as he tried to get into the store. She grabbed Crews and they fell down on the sidewalk. Robinson-Crews held Crews and

attempted to apply pressure to his neck wound. She asked Crews "who did this to you."

According to Robinson-Crews, her husband replied, "Paperboy," which is Brown's alias. Robinson-Crews called 9-1-1. She also made other phone calls, including at least three calls to Crews' mother, Barbara Portis. During one of those calls, Robinson-Crews told Portis that "Paperboy and Youngin" shot Crews. "Youngin" is Dawson's alias. The following morning, Robinson-Crews went to Portis' home, and again told her that "Paperboy and Youngin" shot Crews.

Officers from the Trenton Police Department (TPD) arrived on the scene. Crews was unresponsive and began to lose consciousness. Robinson-Crews told the officers that her husband had been shot inside the home, and a toddler was in the house. The officers entered the home through the backdoor and observed one or two shell casings on the kitchen floor. The officers also observed some blood where the doorway led to the rest of the apartment. An officer located the toddler and placed her in the care of another officer.

Other officers from the TPD arrived and aided in the search for the shooter. In a nearby construction yard, an officer observed freshly-disturbed gravel and footprints. The officer covered the footprints with the lid of a garbage can to preserve them. The

officer recovered a cell-phone charger on the grass in the construction yard. On a nearby street, the officer also found a cell phone next to a parked vehicle and a tan jacket, which had been turned inside out. Another officer recovered a camouflage ski mask on the ground in the passageway between two houses in the area.

A crime scene detective from the TPD also collected "reddish" stains from Whittaker Avenue, impressions of the footprints, and the shell casings from the kitchen floor of the Crews home. The officer later executed a search warrant for Robinson-Crews' vehicle, in which he recovered a cell-phone box. Another detective found a 9-millimeter handgun on the roof of a nearby building.

A forensic scientist from the New Jersey State Police (NJSP) testified that she collected DNA evidence from the camouflage ski mask and tan jacket. Another NJSP forensic scientist compared the samples with DNA samples provided by defendant, and concluded that he could not be excluded as a source of the DNA found on the mask. A ballistics expert from the NJSP testified that the shell casings found in the kitchen of the Crews home had been discharged from the gun recovered from the nearby building.

Confidential informants Isaiah Franklin and Terrell Black also testified. Franklin stated that he spoke with Dawson about the case, while he and Dawson were housed in the Mercer County

Corrections Center (MCCC). According to Franklin, Dawson said he was involved in the Crews murder. He told Franklin he went to Crews' house to steal $40,000 from him, but the robbery went wrong. Dawson said Crews recognized him, so he shot Crews in the neck and escaped out the back door. He said that Crews' "child-mother" arrived and recognized him. According to Dawson, Crews said he could not believe "Youngin would do this to me."

Franklin further testified that he had similar conversations with Brown while in the MCCC. According to Franklin, Brown told him that the mask the police found at the scene had his DNA on it, but he was going to have his girlfriend write an alibi indicating that he tried the mask on and somehow Dawson obtained it. On cross-examination, Franklin said that Brown told him that he and Dawson ran out of Crews' house, jumped over the gate, threw the gun away, and hopped in the car with Brown's girlfriend.

Black testified that he also had conversations with both defendants while they were incarcerated at the MCCC. Dawson told Black he participated in the plan to rob Crews of $40,000, and that he was wearing a ski mask at the time. Dawson said Crews recognized him during the robbery, so he got nervous and shot Crews in the neck. Dawson stated that after he shot Crews, Crews said he could not believe "Paperboy and Youngin" would do this to

6                                                                    A-4898-14T1

him. He stated that he and Brown ran out the back of the Crews house.

Black further testified that Brown told him he set up a plan to rob Crews of $40,000 from his home, and that he was wearing a ski mask during the robbery. Brown stated that Crews was shot in the neck in the house, and Crews' "child mother" came home. Brown left from the back of Crews' home. He said he was going to have his girlfriend write a letter indicating that he tried on the mask and gave it to Dawson, which was how his DNA got on the mask. Brown's girlfriend also would write that Brown was with her at the time of the murder.

Maria Cappelli, an inmate at a State prison in Muncy, Pennsylvania, was called as a witness for the defense. Cappelli was incarcerated with Robinson-Crews. According to Cappelli, Robinson-Crews told her that Crews was killed one night after he returned home. Robinson-Crews said she gave the keys to "a guy" and that "it was all set up." Robinson-Crews also told Cappelli she was "part of the set up" because Crews had been mentally and physically abusive to her.

Cappelli admitted, however, that she waited two years to report this information to the authorities, but did so because she had an attack of conscience. She said she did not get any benefit in exchange for reporting the information. Cappelli stated that

Robinson-Crews indicated the murder had been committed by two gang members, but she did not identify the perpetrators.

The jury found defendants guilty of murder, felony murder, robbery, and possession of a weapon for an unlawful purpose. The judge merged count two (felony murder) with count one (murder), and sentenced both defendants to fifty years of incarceration, with periods of parole ineligibility established pursuant to NERA. The judge also sentenced both defendants to concurrent twenty-year prison sentences for robbery, and ten years of incarceration for the weapons charge. The judge filed judgments of conviction dated June 8, 2015. Defendants' appeals followed.

On appeal, Brown raises the following arguments:

POINT ONE

THE TRIAL COURT ERRED WHERE IT DID NOT DISMISS WITH PREJUDICE THE INDICTMENT DUE TO DETECTIVE BRITTON'S FLAGRANT MISBEHAVIOR WHICH RESULTED IN THE SUPPRESSION OF MATERIAL EVIDENCE FAVORABLE TO THE DEFENDANT.

POINT TWO

THE TRIAL COURT'S DECISION TO REVERSE THE MOTION COURT'S PRETRIAL RULING REGARDING THE ALLEGED DYING DECLARATION WAS NOT BASED ON THE PROPER STANDARD IN ANALYZING ITS ADMISSIBILITY WHERE IT DID NOT FOCUS ON THE FACTS KNOWN TO OR OBSERVED BY CREWS AND AS SUCH UNDULY PREJUDICED THE DEFENDANT'S RIGHT TO A FAIR TRIAL.

POINT THREE

THE TRIAL COURT ERRED WHERE IT RULED
INADMISSIBLE THE WRITTEN STATEMENTS PREPARED
UNDER OATH SHOWING [ROBINSON-CREWS']
KNOWLEDGE OF THE PLOT AND OF THE SHOOTER.

POINT FOUR

THE TRIAL COURT ERRED WHERE IT RULED
ADMISSIBLE AS AN EXCITED UTTERANCE PORTIS'S
TESTIMONY REGARDING [ROBINSON-CREWS']
STATEMENT TO HER ABOUT CREWS' ALLEGED DYING
DECLARATION.

POINT FIVE

THE TRIAL COURT ERRED WHERE IT DENIED THE
DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL
BECAUSE THE STATE'S EVIDENCE WAS INSUFFICIENT
TO WARRANT A CONVICTION AS TO ANY COUNT IN THE
INDICTMENT.

POINT SIX

WHERE THE TRIAL COURT'S EVALUATION OF THE
AGGRAVATING FACTORS APPEARS TO RELATE ONLY TO
THE DEFENDANT'S PRIOR RECORD, A SENTENCE
GREATER THAN THE MANDATORY MINIMUM TERM OF 30
YEARS IS EXCESSIVE.

In his appeal, Dawson raises the following arguments:

POINT I

THE STATE'S EGREGIOUS AND CONTINUOUS FAILURE
TO MAKE TIMELY DISCLOSURE OF DISCOVERY
THROUGHOUT THIS TRIAL DEPRIVED DEFENDANT OF
HIS RIGHT TO A FAIR TRIAL.

POINT II

COMMENTS MADE BY MS. ROBINSON-CREWS ON THE
TELEPHONE OVERHEARD BY DETECTIVE BOLOGNINI AND
MADE A PART OF THE STATE'S SEARCH WARRANT

A-4898-14T1

AFFIDAVIT SHOULD HAVE BEEN ADMITTED INTO EVIDENCE AS PAST RECOLLECTION RECORDED.

POINT III

THE ADMISSION OF TESTIMONY OF SHEENA ROBINSON-CREWS REGARDING THE "DYING DECLARATION" OF TRACY CREWS WHICH WAS CONTRARY TO A PRE-TRIAL RULING MADE BY ANOTHER COURT OF EQUAL JURISDICTION WAS ERRONEOUS AND DEPRIVED THE DEFENDANT OF A FAIR TRIAL.

POINT IV

TESTIMONY OF BARBARA PORTIS CONCERNING A CONVERSATION WITH SHEENA [ROBINSON-CREWS] WAS HEARSAY WHICH SHOULD HAVE BEEN EXCLUDED FOR EVIDENCE.

POINT V

THE TESTIMONY OF JAIL SNITCHES VIOLATED DEFENDANT'S RIGHT OF CONFRONTATION AND SHOULD HAVE BEEN EXCLUDED FROM EVIDENCE.

POINT VI

IT WAS ERROR FOR THE SENTENCING COURT TO FAIL TO MERGE THE CONVICTION FOR POSSESSION OF A WEAPON FOR AN UNLAWFUL PURPOSE WITH THE MURDER CONVICTION. (Not raised below).

POINT VII

DENIAL OF THE DEFENDANT'S MOTION FOR NEW TRIAL WAS ERROR.

POINT VIII

THE SENTENCE IMPOSED UPON THE DEFENDANT OF FIFTY (50) YEARS WITH 85% PAROLE INELIGIBILITY WAS EXCESSIVE AND SHOULD BE MODIFIED AND REDUCED. (Not raised below).

A-4898-14T1

THE AGGREGATE ERRORS DENIED DEFENDANT A FAIR TRIAL. (Not raised below).

## II.

We first consider defendants' contention that the trial judge erred by refusing to dismiss the indictment due to the State's delayed disclosure of certain evidence.

The record indicates that after the trial commenced, the State produced seventeen police reports, which included an affidavit the State had submitted in support of its application for a search warrant. The search-warrant affidavit included statements attributed to Robinson-Crews, which indicated she may have had prior knowledge of the robbery and the identity of the perpetrators. Several days later, the State produced a document dated May 3, 2013, prepared by officials at the Muncy prison in Pennsylvania. The document stated that Cappelli claimed Robinson-Crews told her she was involved in Crews' robbery and murder.

Defendants did not seek a mistrial, but sought dismissal of the charges with prejudice. The judge ordered the State to produce four police officers the next day, so they could be questioned regarding the late production of the evidence. The officers appeared as required, and the judge conducted a N.J.R.E. 104

hearing to explore the reasons the aforementioned evidence had not been produced earlier.

At the conclusion of the hearing, defense counsel again informed the judge that they were not seeking a mistrial because they thought they had "a good case." Brown's counsel told the judge defendants wanted to proceed with the trial because they did not want to give the State "a second bite at the apple," which it was not entitled to and did not deserve.

The judge considered whether defendants would suffer any prejudice as a result of the late production of the records. Defendants' attorneys focused upon the Muncy report. Dawson's attorney stated that perhaps the matter could be resolved "by some type of phone conference" with Cappelli. The State agreed to arrange the call. The judge determined that in the meantime, the trial would continue.

Defense counsel did not object to the resumption of the trial. The conference call with Cappelli took place, and defendants thereafter decided to call Cappelli as a witness. Neither defendant renewed his motion to dismiss the charges with prejudice. Defense counsel cross-examined Robinson-Crews regarding her statements to Cappelli. They also cross-examined Detective Gary Britton of the TPD regarding a meeting he had with Cappelli.

12

On appeal, defendants argue that the trial judge should have granted their motions to dismiss due to the State's "flagrant" misconduct. We disagree.

The State has a "constitutional obligation to provide criminal defendants with exculpatory evidence in the State's possession." State v. Marshall, 148 N.J. 89, 154, cert. denied, 522 U.S. 850, 118 S. Ct. 140, 139 L. Ed. 2d 88 (1997). "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." State v. Knight, 145 N.J. 233, 245 (1996) (quoting Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97, 10 L. Ed. 2d 215, 218 (1963)).

In order to establish a claim under Brady, a defendant must show: "(1) the prosecution suppressed evidence; (2) the evidence is favorable to the defense; and (3) the evidence is material." State v. Martini, 160 N.J. 248, 268 (1999) (citation omitted). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." State v. Parsons, 341 N.J. Super. 448, 455 (App. Div. 2001) (quoting United States v. Bagley, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383, 87 L. Ed. 2d 481, 494 (1985)).

We note that the evidence at issue did not exculpate defendants. The evidence indicated that Robinson-Crews may have had prior knowledge of and some involvement in her husband's robbery and murder, but the evidence did not disclose the names of any third-parties who may have committed the crimes.

In any event, we conclude that the State should have disclosed the evidence. See Giglio v. United States, 405 U.S. 150, 154, 92 S. Ct. 763, 766, 31 L. Ed. 2d 104, 108 (1972) (holding that the State is required to produce evidence that links one of its witnesses to the charged offense). Nevertheless, the judge did not err by failing to dismiss the charges against defendant.

"[T]he decision whether to dismiss an indictment lies within the discretion of the trial court, and that exercise of discretionary authority ordinarily will not be disturbed on appeal unless it has been clearly abused." State v. Hogan, 144 N.J. 216, 229 (1996) (citations omitted). Indeed, as we recently observed:

> [O]ur courts have long held that a dismissal of an indictment is a draconian remedy and should not be exercised except on the clearest and plainest ground. Dismissal is the last resort because the public interest, the rights of victims and the integrity of the criminal justice system are at stake. Even in a case in which we found an investigating officer's brazen misconduct to be wholly reprehensible, we reversed the dismissal of seventeen indictments, stating, "we question whether the public must pay the price by forfeiting its day in court on otherwise properly found

14

indictments." Therefore, although a motion to dismiss an indictment is directed to the sound discretion of the court, an indictment should stand unless it is palpably defective.

[State v. Williams, 441 N.J. Super. 266, 271-72 (App. Div. 2015) (citations omitted.]

Defendants have not shown that they suffered any undue prejudice as a result of the State's late production of the evidence. Moreover, the judge took reasonable measures to ensure that defendants had a fair trial, notwithstanding the late production of the evidence. See State v. Allah, 170 N.J. 269, 280 (2002) (holding that if there is "an appropriate alternative course of action," extraordinary relief such as a mistrial or dismissal with prejudice is not a proper exercise of discretion).

As we have explained, the judge gave defendants time to review the evidence, and allowed them time to conduct a conference call with Cappelli. Defendants also were able to cross-examine Robinson-Crews and Britton about the statements Cappelli attributed to Robinson-Crews.

Based on the record before us on appeal, there is no indication that defendants were unduly hampered in their ability to challenge Robinson-Crews' credibility, based on her alleged prior knowledge of and involvement in the robbery and murder. Therefore, we conclude that the judge's decision to deny defendants' motion to dismiss the charges based on the State's

15

failure to make timely disclosure of the evidence was not a mistaken exercise of discretion.

## III.

Next, defendants argue that the trial judge erred by admitting testimony by Robinson-Crews regarding statements Crews made to her shortly before he died. As noted previously, Robinson-Crews asserted that after Crews was shot, he stumbled out to the street. Robinson-Crews went to his aid and asked him who "did this to you." According to Robinson-Crews, defendant replied "Paperboy," which is Brown's alias.

The motion judge determined that Robinson-Crews could not testify at trial because she was not a credible witness. The judge stated that the testimony Robinson-Crews provided at the pre-trial hearing differed from several statements she made to the investigating officers at or about the time the offenses were committed.

Indeed, Robinson-Crews had conceded that some of her prior statements were false. In ruling on the motion, the motion judge also considered a statement by William Rivera. He said that although Robinson-Crews had repeatedly asked Crews who shot him, he was not able to respond to her questions.

We are convinced, however, that the trial judge did not err by reconsidering the motion judge's determination, after hearing

16

Robinson-Crews testify at trial and conducting a <u>N.J.R.E.</u> 104 hearing at which Robinson-Crews, Rivera, and Portis testified. The "law of the case" doctrine "is designed to avoid re-litigation of the same issue in the same controversy." <u>State v. Ruffin</u>, 371 <u>N.J. Super.</u> 371, 390 (App. Div. 2004). Even so, application of the doctrine is discretionary and it is to be "flexibly applied in the interests of justice." <u>Ibid.</u> (citing <u>State v. Reldan</u>, 100 <u>N.J.</u> 187, 205-06 (1985)).

At the <u>N.J.R.E.</u> 104 hearing, Rivera conceded that he was on the phone with the 9-1-1 dispatcher while Robinson-Crews was speaking with her husband, and Crews may have said something to Robinson-Crews that he did not hear. In addition, Portis testified that on the night of the shooting, Robinson-Crews called her several times and during one call stated that "Paperboy and Youngin shot him." Portis also said that later, Robinson-Crews again told her that "Paperboy and Youngin" shot Crews.

The trial judge's decision to reconsider whether to admit Robinson-Crews' testimony was justified by the more complete record available to the judge. The record supports the judge's finding that Robinson-Crews' testimony about what Crews said to her regarding the shooting was sufficiently credible to allow it to be presented to the jury.

Defendants argue that the judge erred by finding that Crews' statement was admissible under N.J.R.E. 804(b)(2). We review the trial court's evidentiary determination under an abuse-of-discretion standard. State v. Buda, 195 N.J. 278, 294 (2008) (citing Hisenaj v. Kuehner, 194 N.J. 6, 12 (2008)).

"In a criminal proceeding, a statement made by a victim unavailable as a witness is admissible if it was made voluntarily and in good faith and while the declarant believed in the imminence of declarant's impending death." N.J.R.E. 804(b)(2). See also State v. Graham, 59 N.J. 366, 370 (1971). In evaluating the admissibility of a dying declaration, the trial court should consider "'all the attendant circumstances . . . including the weapon which wounded [the declarant], the nature and extent of the [the declarant's] injuries, [the declarant's] physical condition, [the declarant's] conduct, and what was said to and by [the declarant].'" State v. Hegel, 113 N.J. Super. 193, 201 (App. Div. 1971) (citation omitted).

Here, there is sufficient credible evidence in the record to support the trial judge's determination that Crews' statement to Robinson-Crews was admissible under N.J.R.E. 804(b)(2). Crews was obviously unavailable at trial. He made the statement in response to Robinson-Crews' questions, and there is no indication that his statement was coerced or forced. The record also supports the

conclusion that Crews made the statement in good faith, and that he believed his death was imminent at the time.

Defendants argue, however, that Crews' statement was not reliable. In his brief, Brown asserts that Crews' statement was made in response to Robinson—Crews' self-serving inquiry. He also asserts that Robinson-Crews was not a credible witness, as evidenced by the inconsistent statements she made about the robbery and murder. In addition, both Brown and Dawson contend that because the perpetrators wore masks, Crews could not have identified them.

We find no merit in these arguments. As we noted previously, based on Robinson-Crews' trial testimony and the testimony presented at the N.J.R.E. 104 hearing, the trial judge properly determined that Robinson-Crews was a credible witness and that the jury should be permitted to hear her testimony as to what Crews said to her after the shooting.

Moreover, the evidence shows that Brown was Crews' close friend, and for a while, Brown lived with Crews and his wife. In addition, Robinson-Crews said that Brown and Dawson were together all the time. Thus, a jury could reasonably find that Crews was sufficiently familiar with defendants to identify them, even if they were wearing masks. See United States v. Ellis, 121 F.3d 908, 926-27 (4th Cir. 1997) (holding that, although the defendant was masked and wore a hooded sweatshirt, the identification of the

defendant was admissible because the witness had known him for about five years), cert. denied, 522 U.S. 1068, 118 S. Ct. 738, 139 L. Ed. 2d 674 (1998).

IV.

Defendants contend that the trial judge erred by admitting Portis' testimony about Robinson-Crews' statements to her regarding the murder. Defendants assert that the judge admitted these statements pursuant to N.J.R.E. 803(c)(2), the hearsay exception for statements "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition and without opportunity to deliberate or fabricate."

The record shows, however, that the judge admitted the testimony pursuant to N.J.R.E. 803(a)(2). The rule provides that a prior statement by a witness may be admissible if it "would have been admissible if made by the declarant while testifying and the statement . . . is consistent with the witness' testimony and is offered to rebut an express or implied charge against the witness of recent fabrication or improper influence or motive[.]" Ibid.

As noted previously, the judge did not err by permitting Robinson-Crews to testify as to Crews' statements to her after the shooting. On cross-examination, defense counsel attacked Robinson-Crews' credibility by asking her about inconsistencies in the

statements she provided to the police following the robbery and murder. They also implied that her statements showed she had prior knowledge of and was involved with the offenses.

Thus, defense counsel essentially charged Robinson-Crews with a recent fabrication and an attempt to cover up her own involvement with the charged offenses. The record therefore supports the trial judge's ruling that Portis' testimony as to what Robinson-Crews said her to was admissible under N.J.R.E. 803(a)(2) to rebut these allegations.

V.

Defendants further argue that the trial judge erred by excluding statements attributed to Robinson-Crews in an affidavit that Detective Matthew Norton prepared to support the State's search-warrant application. Defendants argue that the statements were admissible under N.J.R.E. 803(c)(5), the hearsay exception for past recollection recorded. N.J.R.E. 803(c)(5) provides in pertinent part that the court can admit

> [a] statement concerning a matter about which
> the witness is unable to testify fully and
> accurately because of insufficient present
> recollection if the statement is contained in
> a writing or other record which (A) was made
> at a time when the fact recorded actually
> occurred or was fresh in the memory of the
> witness, and (B) was made by the witness or
> under the witness' statement at the time it
> was made, and (C) the statement concerns a
> matter of which the witness had knowledge when

it was made, unless the circumstances indicate
that the statement is not trustworthy; . . .

In the State's search-warrant application, Norton stated that Detective Nathan Bolognini responded to the scene after the shooting and heard Robinson-Crews make several phone calls. According to the search-warrant affidavit, the first call "appeared to be with" the shooter, and Robinson-Crews had stated, "You didn't have to shoot him. You got what you came for. You did not need to shoot him." In addition, the affidavit indicated that Robinson-Crews called another person and said, "Those boys did not have to shoot him. They got what they came for. They didn't have to shoot my baby."

Bolognini had testified outside the presence of the jury that he remembered being near Robinson-Crews after the shooting. He recalled that she made several phone calls, but he had no recollection of the content of those calls. He also could not recall reporting anything in particular regarding the calls to his superiors or those investigating the shooting. In addition, Norton testified that he had received a report that Bolognini had overheard Robinson-Crews' calls, however, he could not be sure if the report came directly from Bolognini.

The trial judge conducted a N.J.R.E. 104 hearing to further explore whether the statements in the search-warrant affidavit

should be admitted. Bolognini again testified that he had no recollection of the substance of Robinson-Crews' telephone calls. He did not recall reporting anything in particular to any other officers, and he did not remember whether he discussed the calls with Norton. Norton testified that it was more likely than not that he had received the information from Bolognini himself around the time he prepared the search-warrant application, but he was not one hundred percent sure that the information was reported directly by Bolognini.

The trial judge found that Bolognini was unable to testify fully and accurately about the substance of the phone calls because he did not have sufficient present recollection of the matter. The judge also found that the search-warrant affidavit had been prepared close in time to the events at issue, and Norton prepared the affidavit at Bolognini's direction or the direction of another superior. The judge found, however, that under the circumstances, the statements included in the affidavit were not trustworthy because Norton was not certain as to whether he had received the information directly from Bolognini or from some other officer.

Defendants contend Norton's testimony was sufficient to establish that the statements attributable to Bolognini were trustworthy. Defendants note that Norton had attested to the truthfulness of the statements in the search-warrant affidavit.

We conclude, however, that the judge's ruling was not a mistaken exercise of discretion. There is sufficient credible evidence in the record to support the judge's finding that, in the absence of some conversational link between Norton and Bolognini, the statements attributable to Bolognini were not trustworthy.

The court noted that Bolognini did not document Robinson-Crews' statements in any official report, and Norton could not recall with any certainty who had provided him with the information included in the affidavit. Bolognini also could not recall what Robinson-Crews said during the phone calls. Another officer may have told Norton what Bolognini said about the calls, and the officer's statement may not have been accurate.

We also conclude that even if the judge erred by excluding this evidence, the ruling does not give rise to a reasonable doubt regarding the jury's verdict. State v. Macon, 57 N.J. 325, 336 (1971). The statements in the affidavit attributed to Robinson-Crews would not have exonerated either defendant. The statements indicated that Robinson-Crews may have had prior knowledge of and some involvement with the robbery and murder, but she did not identify the person or persons to whom she was speaking. Indeed, a reasonable jury could have inferred that Robinson-Crews had been speaking with one or both defendants.

24                                                    A-4898-14T1

Moreover, Cappelli testified that Robinson-Crews told her that she knew of and was involved in the robbery and murder of her husband. The statements in the affidavit attributed to Robinson-Crews would have been cumulative evidence. Therefore, if the judge erred by excluding this evidence, the error was harmless. The exclusion of the evidence does not raise a reasonable doubt as to whether defendants committed the charged offenses. Ibid.

VI.

Dawson argues that the admission of testimony from informants Isaiah Franklin and Terrell Black violated his right to confrontation. Dawson contends that Franklin and Black's testimony included statements that Brown made about him, which implicated Dawson in the robbery and murder. He contends that the admission of this testimony violated his right to confrontation under the Sixth Amendment to the United States Constitution because Brown did not testify and he did not have the ability to confront Brown about the statements.

The Confrontation Clause prohibits the admission of testimonial statements of a witness who does not appear at trial, unless the witness was unavailable, and the defendant had a prior opportunity for cross-examination. Crawford v. Washington, 541 U.S. 36, 68, 124 S. Ct. 1354, 1374, 158 L. Ed. 2d 177, 203 (2004).

Furthermore, hearsay statements of a co-defendant implicating a defendant may not be admitted when the defendants are tried together. Bruton v. United States, 391 U.S. 123, 135-36, 88 S. Ct. 1620, 1627-28, 20 L. Ed. 2d 476, 484-85 (1968).

However, Bruton only applies to testimonial statements that are subject to the Confrontation Clause. United States v. Berrios, 676 F.3d 118, 128 (3d Cir. 2012); United States v. Dargan, 738 F.3d 643, 651 (4th Cir. 2013). Statements made unwittingly to a government informant are not testimonial statements for purposes of the Confrontation Clause. United States v. Hargrove, 508 F.3d 445, 449 (7th Cir. 2007) (citing Davis v. Washington, 547 U.S. 813, 824-25, 126 S. Ct. 2266, 2275, 165 L. Ed. 2d 177, 238-39 (2004), and Crawford, supra, 541 U.S. at 58, 124 S. Ct. at 1368, 158 L. Ed. 2d at 196-97).

Franklin and Black were confidential informants, who spoke with Brown in the MCCC. Brown unwittingly made statements to Franklin and Black regarding the murder and robbery. Brown's statements were not testimonial and their admission did not deny Dawson of his right to confrontation. Therefore, the trial judge did not err by allowing Franklin and Black to testify about Brown's statements implicating Dawson in the charged offenses.

Moreover, even if the judge erred by admitting Brown's statements implicating Dawson, the admission of this testimony

does not warrant reversal of the conviction because the error was harmless beyond a reasonable doubt. Macon, supra, 57 N.J. at 336. At trial, Franklin testified that Dawson told him he was involved in Crews' robbery and murder. Dawson said he went to Crews' house to rob him of $40,000, and stated that he shot Crews because Crews had recognized him. Black provided similar testimony.

Based on Dawson's own admissions to Franklin and Black, the jury had more than enough evidence to support its verdict finding Dawson guilty of the charged offenses without any reliance upon Brown's statements implicating Dawson. Thus, even if erroneous, the admission of Franklin and Black's testimony as to what Brown said about Dawson's involvement in the robbery and murder was harmless.

## VII.

Defendants argue that the judge erred by denying their motions for acquittal and a new trial. They argue that the judge should have granted the motion because of the State's discovery violations, the judge's failure to follow the motion judge's ruling on the admission of Crews' dying declaration, and the judge's failure to admit the statements in Norton's search-warrant application. Defendants also argue that the verdict was against the weight of the evidence.

27                                                      A-4898-14T1

A motion for a new trial may not be granted unless the verdict represents "a miscarriage of justice under the law." R. 2:10-1; State v. Perez, 177 N.J. 540, 555 (2003). We have rejected defendants' contentions regarding the State's untimely production of evidence and the judge's evidentiary rulings. Therefore, these rulings did not provide a basis for granting defendants' motion for a new trial.

We also conclude that the verdicts were not against the weight of the evidence. The State presented sufficient evidence from which a reasonable jury could find defendants guilty of the charged offenses beyond a reasonable doubt. State v. Reyes, 50 N.J. 454, 459 (1967).

Defendants further argue that they were denied a fair trial due to the cumulative errors of the trial judge. This contention lacks sufficient merit to warrant discussion. R. 2:11-3(e)(2).

## VIII.

Defendants contend that their sentences are excessive. Here, the trial judge found the following aggravating factors as to both defendants: three, N.J.S.A. 2C:44-1(a)(3) (risk that defendant will commit another offense); six, N.J.S.A. 2C:44-1(a)(6) (extent of defendant's prior criminal record and the seriousness of the offenses of which he has been convicted); and nine, N.J.S.A. 2C:44-

1(a)(9) (need to deter defendant and others from violating the law). The judge found no mitigating factors.

The judge merged count two (felony murder) with count one (murder), and sentenced both defendants to fifty years of incarceration for the murder, with eighty-five percent periods of parole ineligibility pursuant to NERA. The judge also imposed concurrent twenty-year terms on count three (robbery), and concurrent ten-year terms on count four (possession of a weapon for an unlawful purpose).

Brown asserts that the aggravating factors found here are ordinarily found in every other criminal case. He asserts that the judge's findings are based entirely on his prior criminal record. He contends his sentence should not have exceeded thirty years of incarceration.

Dawson argues for the first time on appeal that the judge should have merged count three with count one. He contends that because his prior convictions were for third- and fourth-degree offenses, the judge should have sentenced him to thirty years of incarceration with thirty years of parole ineligibility.

The scope of our review of the trial court's "sentencing decisions is relatively narrow and is governed by an abuse of discretion standard." State v. Blackmon, 202 N.J. 283, 297 (2010). We may not set aside a sentence unless the trial court did not

follow the sentencing guidelines; the court's findings of aggravating and mitigating factors were not based upon sufficient credible evidence in the record; or the court's application of the sentencing guidelines to the facts of the case "shock[s] the judicial conscience." State v. Bolvito, 217 N.J. 221, 228 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).

We agree with Dawson's contention that count three (possession of a weapon for an unlawful purpose) should have merged with count one (murder). See State v. Tate, 216 N.J. 300, 308 (2013) (noting that merger is required when the only unlawful purpose in possession of a weapon is its use to commit the substantive offense). Accordingly, we vacate the sentences imposed on count three, and remand the matter to the trial court for entry of corrected judgments of conviction for both defendants, merging count three with count one.

However, in all other respects, the record shows that the judge followed the sentencing guidelines, the findings of aggravating factors are supported by sufficient credible evidence in the record, and the sentences imposed do not represent an abuse of the trial court's sentencing discretion.

Affirmed in A-4898-14 and A-5221-14, and remanded to the trial court for entry of judgments of conviction as required by this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4898-14T1